IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **PERDUE FARMS, INC. and PERDUE FOODS, LLC,** | * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Case No. 1:19-cv-01550-SAG |
| **NATIONAL UNION FIRE INS. CO. OF PITTSBURGH, PA,** | * * * | |
| Defendant. | * * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## **MEMORANDUM OPINION**

Plaintiffs Perdue Farms, Inc. and Perdue Foods, LLC (collectively, "Perdue") filed this action against Defendant National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), asserting breach of contract and seeking declaratory judgment. Perdue filed a Motion for Summary Judgment, ECF 76. National Union opposed Perdue's Motion and filed its own Cross Motion for Summary Judgment, ECF 80. Both National Union and Perdue filed oppositions to the other's summary judgment motion. ECF 81, 82. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, Perdue's motion will be granted and National Union's motion will be denied.

## I.  FACTUAL BACKGROUND

There is no substantive dispute over the facts at issue, which are summarized in Perdue's Complaint, ECF 1. Perdue Farms, Inc. and Perdue Foods, LLC, are growers and sellers of chickens and are located in Salisbury, Maryland. In 2016, Perdue obtained an insurance policy from National Union, which contained a sublimit for anti-trust claims of $15,000,000 (the "2016 Policy"). Perdue obtained a subsequent policy in 2017 from National Union with the same

conditions and coverage (the "2017 Policy").  During the term of the 2016 Policy, Perdue was sued in the United States District Court for the Northern District of Illinois by commercial and consumer purchasers of "broilers" (chickens raised for consumption) for violations of the Sherman Antitrust Act and other state law antitrust claims (the "Purchaser Actions").  Perdue reported the claim to National Union, and National Union agreed to indemnify Perdue under the 2016 Policy.

In 2017, various "growers" that raise chickens for Perdue filed a separate set of actions in the United States District Court for the Eastern District of Oklahoma (the "Grower Actions").  The complaint alleged violations of the Sherman Antitrust Act and other antitrust violations.  Perdue promptly reported the claim to National Union under the 2017 Policy, since the lawsuit was filed during its effective dates.  National Union denied coverage under the 2017 Policy, stating that the facts arose from the same facts as the Purchaser Actions and therefore the claims were related under the 2017 Policy's "Related Wrongful Act(s)" clause, such that coverage for both claims was limited to the 2016 Policy.  Plaintiffs filed this declaratory judgment and breach of contract action in the Circuit Court for Wicomico County, Maryland and Defendant removed this matter to this Court.

The key contractual provisions are as follows.  The 2017 Policy's clause regarding "Related Wrongful Act(s)" provides that National Union "shall not be liable" for any claim:

> . . . . alleging, arising out of, based upon or attributable to the facts alleged, or to the same or Related Wrongful Act(s) alleged or contained in any Claim which has been reported, or in any circumstances of which notice has been given, under any directors and officers liability policy of which this D&O Coverage Section is a renewal or replacement of in whole or in part or which it may succeed in time[.]

ECF 76-7 at 127.  The 2017 Policy defines "Related Wrongful Act(s)" as:

> Wrongful Act(s) which are the same, related, or continuous, or Wrongful Act(s) which arise from a common nucleus of facts. Claims can allege Related Wrongful Act(s) regardless of whether such Claims involve the same or different claimants, Insureds or legal causes of action.

2

*Id.* at 14.

## II. LEGAL STANDARDS

Both Perdue and National Union seek summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure. Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that there is no genuine dispute of material fact. *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477

3

U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

### III.  ANALYSIS

#### a. Disputes Regarding the Applicable Legal Standards

The substance of this dispute centers on only one issue: whether the Grower Actions are related to the earlier Purchaser Actions covered by the 2016 Policy, such that the Grower Actions are also covered under the 2016 Policy and not the 2017 Policy. Central to the resolution of this issue are two points of law on which the parties do not agree. First, the parties disagree about the scope of materials the Court should consider in determining whether the lawsuits stem from Related Wrongful Act(s). Second, the parties disagree as to who bears the burden to demonstrate that the Purchaser and Grower Actions are Related Wrongful Act(s). Both issues must be decided prior to delving into the scope of the relevant contractual provisions.

#### i. The Scope of the Materials Considered

Perdue asserts that the Court should only consider the pleadings in the Purchaser and Grower Actions to determine whether the two Actions are based on "Related Wrongful Act(s)." ECF 76-1 at 12-13. National Union, meanwhile, suggests that the Court should take a broader view and consider discovery materials from the two Actions as well. ECF 80-1 at 18-19. The "Related Wrongful Act(s)" provision uses the language of allegations and "Claims"—defining a "Claim" as a "complaint or similar pleading"—suggesting that only the pleadings are to be considered under the plain language of the 2017 Policy. *See* ECF 76-7 at 10, 127; *see also*

*Northrop Grumman Corp. v. Axis Reinsurance Co.*, 809 F. App'x 80, 89 (3d Cir. 2020) (rejecting the consideration of "various statements made by the litigants" in the underlying claims to determine relatedness because "those statements [fell] beyond the four corners of the complaints and the policies"). This is the Court's first opportunity to assess the scope of the provision, and the prior statements and determinations cited by National Union, made in the separate context of discovery, do not alter its interpretation of the provision's language. *See infra* note 3. As such, the Court concludes that, per the 2017 Policy's own plain language, it may only consider the pleadings when determining whether the two Actions are Related Wrongful Act(s).

### ii. The Burden

The parties also disagree as to which party bears the burden of proving relatedness in determining whether the Purchaser and Grower Actions are "Related Wrongful Act(s)." National Union, as the insurer, bears the burden of showing the applicability of policy exclusions. *See ACE Am. Ins. Co. v. Ascend One Corp.*, 570 F. Supp. 2d 789, 798 (D. Md. 2008); *see also Trice, Geary & Myers, LLC v. Camico Mut. Ins. Co.*, 459 F. App'x 266, 274 (4th Cir. 2011) (stating that, in Maryland, "[t]he burden is on the insurer, not the insured, to prove the applicability of an exclusion"). Perdue, meanwhile, bears the burden "of proving every fact essential to [its] right to recover" regarding the scope of the policy's coverage. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Porter Hayden Co.*, No. CIV. CCB-03-3408, 2012 WL 734170, at *2 (D. Md. Mar. 6, 2012).

The Related Wrongful Act(s) provision is an exclusion because its purpose is to delineate claims that would otherwise be covered by the 2017 policy, but which are not ultimately covered because they relate back to the earlier 2016 policy. ECF 76-7 at 127; *see also ACE Am. Ins. Co.*, 570 F. Supp. 2d at 798 (deeming a similar "Interrelated Wrongful Acts" provision to be an exclusion). National Union suggests however, that, this dispute is instead governed by the

"Related Claims Provision" found in both the 2016 and 2017 Policies, which it says merely defines the scope of coverage and thus places the burden on Perdue. ECF 80-1 at 24-25. The plain language of the Related Claims Provision suggests, however, that it is only implicated when an insured seeks to affirmatively bring a claim under the 2016 Policy by virtue of its being related to earlier claims. *See* ECF 76-4 at 7. Put differently, the fundamental distinction is that the "Related Wrongful Act(s)" clause is an exclusion mechanism for the *insurer to deny coverage* under the 2017 policy, whereas the Related Claims Provision is a "scope of the coverage" mechanism for the *insured to seek coverage* under the 2016 policy. *See Northrop Grumman Corp. v. Axis Reinsurance Co.*, 809 F. App'x 80, 86 (3d Cir. 2020) ("The 2016 policy's prior-notice exclusion *disclaimed* coverage . . . [a]nd the 2006 policy's relation-back clause *accepted* coverage for claims . . . ."). Thus, had Perdue been affirmatively attempting to seek coverage under the 2016 policy, then the Related Claims Provision would govern, and it would bear the burden. Here, however, Perdue is unmistakably seeking coverage under the 2017 policy and National Union is attempting to disclaim it based on the "Related Wrongful Act(s)" clause. Since it is an exclusion, National Union bears the burden of showing that the Purchaser and Grower Actions are Related Wrongful Act(s).

      **b. Interpretation of the Contract and the Relevant Actions**

The parties agree that the dispositive issue in this case is whether the Grower and Purchaser Actions "arise from a common nucleus of facts" and "bear logical or causal relationships to one another." ECF 81-1 at 17; ECF 82 at 9. The "Related Wrongful Act(s)" clause must be construed "broadly," but "[a]t some point, a relationship between two claims, though perhaps 'logical,' might be so attenuated or unusual that an objectively reasonable insured could not have expected they would be treated as a single claim under the policy." *Northrop Grumman*, 809 F. App'x at 88

(citations and internal quotation marks omitted). National Union has, for the following reasons, failed to carry its burden of showing that the Purchaser and Grower Actions are sufficiently related.

Both Perdue and National Union assert that the "method or modus operandi" is the most important factor in determining relatedness. ECF 76-1 at 26; ECF 80-1 at 37. While courts in this District have not adopted the "method or modus operandi" terminology *per se*, it is well-established that the crux of the interrelatedness analysis compares how the alleged schemes are carried out, with a focus on the specific elements of the schemes impacting the plaintiffs' experiences. *See W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co.*, No. GJH-14-00425, 2014 WL 5812316, at *7 (D. Md. Nov. 7, 2014) (finding actions to be interrelated where a "common scheme" existed "involving the same claimant, the same fee commission, the same contract, and the same real estate transaction"); *see also ACE Am. Ins. Co. v. Ascend One Corp., 570 F. Supp. 2d 789, 801* (D. Md. 2008) (finding claims unrelated because they were related only by general business practices rather than "focusing on the specific experiences of the . . . plaintiffs").

Here, the Complaints outline two distinct methods of anticompetitive conduct designed to achieve two separate collusive ends. The Grower Plaintiffs, for one, allege that defendants' "Scheme" consisted of: (1) information sharing agreements to share confidential data on Grower compensation with one another, and (2) "no-poach" agreements in which they "agreed not to solicit or recruit . . . [or] hire" Growers from one another. ECF 76-5 at 18-24. The Grower Plaintiffs further allege that, in order to further this scheme, the defendants entered into "contract farming arrangements" with their Growers to control "all aspects of Broiler production," including compensation for the Grower. *Id.* at 13. Through these "near uniform" contract farming agreements, the defendants allegedly "set Grower base pay at identical or near identical levels." *Id.* at 32. Another major facet of the wage suppression scheme alleged by the Growers is the

7

"Tournament System" of compensation utilized by each defendant. The Tournament System is "a rigid and formulaic compensation scheme under which Growers" are "rank[ed] against each other," with these rankings leading to payments above and below base compensation based off of Grower performance. *Id.* at 35-36. That base compensation rate is, allegedly, set using the wage data exchanged via the information sharing agreement mentioned above. *Id.*

The Purchaser Complaint, on the other hand, makes no mention of "no-poach" agreements, contract farming agreements, the Tournament System, or any of the other alleged mechanisms for manipulating Grower compensation. Instead, the Purchaser Plaintiffs allege a distinct set of "methods" and "mechanisms" utilized by the defendants to "manipulate [broiler] supply." ECF 76-3 at 68. Those methods include reducing their number of breeder chickens so that fewer eggs are laid, reducing the number of eggs placed in incubators, destroying incubating eggs prior to hatching, breaking eggs prior to placement in the incubators, and exporting hatching eggs to non-United States markets. *Id.* at 68-69. Additionally, Purchaser Plaintiffs allege that defendants slowed down, temporarily closed, or permanently closed a number of broiler processing plants. *Id.* The Purchaser Complaint also includes allegations that defendants artificially raised prices by manipulating a broiler pricing index relied upon to set contract prices, *id.* at 143-44, and switching from fixed-price contracts to variable-price contracts to better benefit from rising broiler prices, *id.* at 136-138. Unsurprisingly, none of these alleged techniques for reducing broiler supply and inflating prices appear in the Grower Complaint. Given the vastly differing alleged methods for carrying out the distinct wage suppression and broiler price inflation schemes, the Grower and Purchaser Actions do not "arise from a common nucleus of facts," nor do they "bear logical or causal relationships to one another."

National Union suggests that the above differences are immaterial "micro-distinctions," ECF 80-1 at 9, and that a common "method or modus operandi" is, in fact, alleged in both Grower and Purchaser Actions. Specifically, it points out that both sets of Plaintiffs allege the central role of Agri Stats in distributing confidential information to the defendants, giving them the analytical insight needed to suppress wages and inflate prices. *Id.* at 37-38. It also relies on the Complaints' shared reference to many of the same exact trade association meetings, plus their similar descriptions of the poultry industry's susceptibility to anticompetitive activity, as further evidence of the overlap between the two actions. *Id.* at 32-36. While these overlapping allegations might arguably appear to be part of a common modus operandi when viewed from a distance, the relatedness analysis requires a closer examination focusing on the "specific experiences of the . . . plaintiffs." *ACE Am. Ins. Co.*, 570 F. Supp. 2d at 801. The specific experiences of the Grower and Purchaser Plaintiffs are dissimilar from one another, from the various distinct anticompetitive tactics used (i.e. breaking eggs versus "no-poach" agreements) to the markedly different types of Agri Stats data that the defendants used to effectuate the two schemes (wage data versus broiler production data).[1] National Union's suggested commonalities demonstrate only that both sets of Plaintiffs identified several of the same circumstantial *enablers* of anticompetitive conduct, rather than similar anticompetitive conduct itself. Put differently, trade organization meetings and Agri

---

[1] It is particularly telling that while both Complaints discuss Agri Stats at length, defendants' alleged use of Agri Stats in the Purchaser and Grower Actions involved using different information for wholly different purposes. ECF 76-5 at 10 (summarizing Agri Stats's role in the alleged conspiracy as "serv[ing] as a conduit by which the [defendants] shared, *inter alia*, detailed, competitively sensitive, non-public information about Grower compensation"); ECF 76-3 at 6 (summarizing the relevant information allegedly shared via Agri Stats to be the exchange of "detailed, competitively sensitive, and closely-guarded non-public information about prices, capacity, sales volume, and demand. . . ."). This epitomizes the fact that the commonalities highlighted by National Union exist only at the most general, abstract level and disappear once one delves into the substance of the two respective sets of allegations.

Stats are alleged to be vehicles enabling Perdue and others to engage in wage suppression and price inflation, but the substance of the two respective schemes themselves are the ways Perdue and the other defendants *used* the information to actually harm the Grower and Purchaser plaintiffs—and those courses of action are entirely distinct as outlined above.[2]

To better understand just how substantive the distinctions in anticompetitive methodologies outlined above are, it is useful to consider briefly how the Purchaser and Grower Complaints would look if the supposed "micro-distinctions" were subtracted and only the overlapping high-level allegations relied upon by National Union remained. If Perdue and the other defendants were alleged only to have used Agri Stats and attended the same trade association meetings in order to share confidential information, without any further action, both sets of Plaintiffs would face a considerably tougher challenge in establishing anticompetitive activity, let alone alleging any harm arising from it. As this Court has pointed out elsewhere, there is nothing inherently anticompetitive or illegal about using data benchmarking services like Agri Stats. *Jien v. Perdue Farms, Inc.*, No. 1:19-CV-2521-SAG, 2020 WL 5544183, at *8 (D. Md. Sept. 16, 2020). Similarly, trade association meetings where confidential data are exchanged are not inherently anticompetitive either. *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) ("[P]articipation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement."). Instead, it is the *implementation of the anticompetitive schemes*—through, for example, the destroying of eggs or "no-poach" agreements—that inflates prices or suppresses wages. Allegations pertaining to how

---

[2] Importantly, it is not the fact that the Purchasers and Growers allege different harms that is dispositive. As National Union points out, parties can be harmed in different ways by the same or related anticompetitive conduct. ECF 80-1 at 41. The relatedness analysis centers on comparing the alleged anticompetitive conduct, which here involves two distinct schemes separated by substantive methodology, not just alleged harm.

10

the schemes were carried out necessarily lie at the very heart of any attempt to determine interrelatedness because without them, the alleged anticompetitive effect giving rise to the two Complaints would hardly exist at all.  Yet such methods of implementation are the very allegations National Union suggests should not be compared, despite their critical importance to the Grower and Purchaser Actions as explained in the respective Complaints.  The high-level commonalities that National Union references, on the other hand, are, at best, conduits that enable the anticompetitive conduct in question.  As such, they cannot overcome the myriad scheme-specific details that differ significantly across the wage suppression and price inflation schemes, particularly since National Union bears the burden of proving interrelatedness in the first place.

National Union emphasizes several lines in the Grower Complaint stating that "the [Grower wage suppression] Scheme serves as a means to collectively reduce Broiler output, which ultimately causes an artificial inflation of Broiler prices to final consumers," ECF 76-5 at 35; *see also id.* at 36-37 (noting the increase in broiler prices and the lack of correlated increase in grower wages), suggesting that this reference demonstrates interrelatedness.  This allegation's barebones assertion of a relationship between grower compensation and broiler price inflation does not include any details as to *how* wage suppression increases prices, citing "the law of supply and demand" without any further explanation.  The Court is left to guess whether and to what extent the mechanics of this relationship between wage suppression and price inflation overlap with the price inflation conspiracy alleged in the Purchaser Actions.  While relatedness is to be construed broadly, one standalone paragraph, amidst pages and pages detailing highly specific and entirely distinct methods of suppressing wages, is not enough to transform the entire action into a Related Wrongful Act.  Indeed, it is telling that the Purchaser Complaint contains no reference whatsoever to a relationship between increased prices and wage suppression (or any of the other scheme-

specific facts underlying the Grower Actions).[3]  If suppressing Grower wages was truly part of or related to the alleged scheme to inflate broiler prices, surely the Purchaser Plaintiffs would make at least *some* mention of how such wage manipulation tied to price inflation in their detailed 466-paragraph, 148-page Complaint.  Cumulatively, a few conclusory lines in the Grower Complaint cannot overcome the distinct wage suppression scheme alleged or the fact that the Purchaser Complaint fails to mention wage suppression at all—particularly since National Union bears the burden of showing relatedness.[4]

Furthermore, while National Union provides a number of cases to support its position, none of them stand for the proposition that entirely distinct anticompetitive methodologies can be overlooked in favor of a handful of high-level, circumstantial parallels pertaining to general factor that enable the anticompetitive conduct.  In fact, each of National Union's cases involves sets of

---

[3] National Union cites several references in the Purchaser Complaint to different contract-farmer antitrust cases, ECF 80-1 at 15, but those references only "suggest a practice of coordination and collusion among Defendants" *generally*, *see* ECF 76-3 at 64-65, 118.  In other words, the Purchasers reference the other, separate contract-grower actions as examples of collusion existing in the industry at large, thus making it more plausible that it exists in the particular circumstance of price inflation as well.  There are no allegations in the Purchaser Complaint actually suggesting a logical or causal *relationship* between price inflation and wage suppression.

[4] While the Court in Section III(a)(i) interpreted the 2017 Policy's "Related Wrongful Act(s)" provision to restrict the relatedness analysis to the pleadings alone, its decision to grant summary judgment for Perdue would not have changed even had National Union's materials from outside the pleadings been considered.  Specifically, National Union relies upon several references in the Grower Complaint that call the Purchaser Actions an "ongoing, related anti-trust case," ECF 80-6 at 4, and an "overarching, unitary conspiracy," ECF 80-7 at 3, among other references.  *See* ECF 80-1 at 18-19.  As with the language contained in ¶ 145 addressed above, such isolated mentions of the Purchaser Actions and their relationship to the Grower Actions is not enough to overcome the divergent specific wrongful acts alleged in the two respective Complaints (namely, suppressing wages versus inflating prices) as well as the divergent methods used to achieve those anticompetitive ends.  One-off statements made by litigants in motion-specific contexts having nothing to do with either the relatedness analysis or the pleadings, and made over the course of extensive litigation, "are hardly reliable indicators of relatedness." *See Northrop Grumman*, 809 F. App'x at 89.  The same goes for National Union's reliance on a handful of references to growers made in depositions taken as part of the Purchaser Actions.  ECF 80-1 at 19.

allegations constituting a closely related common transaction or scheme, demonstrating by contrast just how *unrelated* the Grower and Purchaser Actions are here. *W.C. & A.N. Miller Dev. Co.*, for example, involved a lawsuit to recover damages associated with alleged actions taken to avoid paying a judgment issued in an earlier proceeding. 2014 WL 5812316, at *7. This subsequent recovery action was deemed to be related to the earlier lawsuit in which judgment had been issued, because the earlier lawsuit was a but-for cause of the later one.[5] *Id. Kilcher v. Cont'l Cas. Co.*, meanwhile, found relatedness because the harm (breach of fiduciary duty) was carried out by defendant "in the same way" regardless of plaintiff. 747 F.3d 983, 990 (8th Cir. 2014). While the defendant "made different alleged misstatements, omissions, and promises on different dates to each Plaintiff," the core mechanics of the scheme remained the same: preying on inexperienced investors by advising them to invest in certain life insurance policies and other instruments. *Id.* at 986.[6] Similarly, in *Realcomp II, Ltd. v. Ace Am. Ins. Co.*, the court deemed the claims to be interrelated because they were based upon the exact same scheme, preventing real-estate brokers from accessing a database containing key property information. 46 F. Supp. 3d 736, 742 (E.D. Mich. 2014). *Northrop Grumman*, lastly, also involved allegations of nearly the exact same

---

[5] National Union points out that the *Miller Dev.* Court stated that "so long as even a single fact, circumstance, situation, transaction or event logically or causally connects [the actions], then they would be 'Interrelated Wrongful Acts.'" ECF 82 at 7. However, this reflects the expansive terms of the contractual provision at issue in that case and is not a principle that can be readily imported. In fact, the far more lenient contractual definition of "relatedness" in *Miller Dev.* undermines the case's persuasive relevance here, where a stricter definition requiring a "common nucleus of facts" exists in the 2017 Policy.

[6] The "different alleged misstatements, omissions, and promises on different dates to each Plaintiff" in *Kilcher* are the genesis of National Union's "micro-distinctions" argument. ECF 80-1 at 30-31. The contrast between those distinctions and the ones identified in this case is striking. Making one misstatement or omission instead of another is merely a variation on a theme—a different tactic in a singular scheme. Reducing a breeder chicken flock versus engaging in a "no-poach" agreement, on the other hand, goes well beyond mere tactical variation and is a different form of conduct entirely, evincing a completely different scheme.

scheme—the mismanagement of retirement accounts by overpaying itself for certain account management services.  809 F. App'x at 89-90.

Here, on the other hand, there is no common scheme, transaction, or lawsuit tying the Purchaser and Grower Actions together.  The Grower Actions do not arise out of the previous Purchaser Actions, as in *W.C. & A.N. Miller Dev. Co.* and *Realcomp II*, nor do they include allegations suggesting that the Growers were injured by the same sort of anticompetitive acts as the Purchasers were, as in *Kilcher* and *Northrop Grumman*.  Instead, the Purchaser and Grower Actions allege different antitrust conspiracies facilitated by wholly distinct wrongful acts—the utilization of methods like "no-poach" agreements for restricting competition of labor in the Grower Actions, contrasted with the utilization of methods like egg destruction and exporting for reducing supply of broilers in the Purchaser Actions.  Given these stark and substantive differences in methodology underlying the two respective Complaints, "an objectively reasonable insured could not have expected [the Grower and Purchaser Actions] would be treated as a single claim under the policy" and thus they are not logically or causally connected.  *See Northrop Grumman*, 809 F. App'x at 88.  National Union has thus not carried its burden of showing that the Purchaser and Grower Actions are Related Wrongful Act(s) under the terms of the 2017 Policy.

## IV.     CONCLUSION

For the reasons set forth above, Perdue's Motion for Summary Judgment, ECF 76-1, will be GRANTED, and National Union's Cross Motion for Summary Judgment, ECF 80-1, will be DENIED.  A separate implementing Order follows.

Dated:  February 8, 2021                                                          /s/
                                                                    Stephanie A. Gallagher
                                                                    United States District Judge